RENE L. VALLADARES
Federal Public Defender
Nevada State Bar # 11479
WILLIAM CARRICO
Assistant Federal Public Defender
Nevada State Bar # 003042
411 E. Bonneville Avenue, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax

Counsel for Thomas A. Cecrle

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:12-cr-400-JAD-GWF |
| Plaintiff, | SENTENCING MEMORANDUM OF DEFENDANT THOMAS CECRLE |
| vs. | |
| THOMAS A. CECRLE, *et.al.*, | |
| Defendants. | |

Certification: This Memorandum is *not* being timely filed, but is being filed two days beyond the normal due date. Counsel for the government has been informed of the possible delay.

I.

Position Statement.

Some time ago, on an occasion wherein this Court was considering conditions of release for one or more of the defendants, permission was given for the defendants to freely communicate with each other. The government expressed no objection at the time. The defendants in this case, having been friends for years have appreciated, and not abused, the Court's indulgence in this regard. Before beginning to advocate for Mr. Cecrle's sentence, and so as not to overlook what might seem a minor consideration, it is respectfully requested that any final order of this court as to conditions of supervision, continue to permit Mr. Cecrle to have normal social contact with other of the co-

/ / /

1  defendants in the case.   (This would of course only apply to persons formerly named as

2  codefendants, and not any witnesses or victims in the case.)

3        The Presentence Investigation Report in this case (hereinafter, "the PSR"), recommends a

4  custodial term of 121 months for Mr. Cecrle.   This is, as pointed out in the PSR and by the

5  government in its sentencing memorandum, due primarily to the application of two additional points

6  for a greater number of victims and a lack of consideration for the fact that all defendants entered

7  plea agreements. (PSR, p. 11, at 43-52).  The Parties' agreement recommends a sentence of no more

8  than 78 months, and Mr. Cecrle may ask for less.   The factors recommended both in the Parties

9  calculation, and by the PSR, are entitled to more deference than any this Court may find to be

10  applicable, and which may be a more accurate reflection of his case.

11                                              II.

12                            Mr. Cecrle is no "mastermind".

13        While it may give comfort to some, (and serve as a basis to argue about lesser degrees of guilt

14  for others), to opine that Mr. Cecrle masterminded losses of $2.8 million, those claims, in light of

15  the facts of the case, seem laughable.   A mere passing familiarity with the facts of this sprawling case

16  will show the truth of that statement.   Consider for example, the restitution amount of $2.8 million

17  over the 10 years that the conspiracy supposedly existed.   That works out, of course, to an average

18  of about $287 thousand for each of those ten years.   According to the available casino records, Mr.

19  Cecrle lost about $1 million during part of that time gambling.   If you consider Cecrle's own,

20  unreliable, estimate (PSR p. 22, at 94), he would gamble about $120 thousand away each year.   This

21  does not take into account the fortune that he must have wasted on his methamphetamine addiction.

22  (PSR, p. 22 at 96).   This doesn't fit the mastermind mold.

23        What emerges from a closer examination of the facts, is a picture of a group of amateur

24  hucksters held together by laziness, self-deception, ignorance and greed.   Consider the very premise

25  that started it all.   Cecrle made a claim that he spoke to a former state senator that told him about the

26  vast potential available in wrapping up water rights.   Cecrle never showed anything purporting to

27  represent a legal claim on those rights.   The whole thing seems most like a variation on the, nearly

28  ancient, offering to sell the Brooklyn Bridge to the country rube.

                                              2

1    Every claim made, whether water, World War I bonds, or real estate was equally without a

2    hint of substance, each promise consisted, for the most part, on the verbal assurances of Cecrle

3    repeated and embellished through the mouths of Connie Fenton and other co-defendants, and fellow

4    travelers. They couldn't even be bothered to employ the standard grifter's device of a "show."

5    Should Cecrle be forgiven because it is hard to believe that people gave him money? The answer

6    to that retorical question is obviously no. All victims are vulnerable to some extent, but to be

7    successful, every con exploits characteristics of human nature, like dishonesty, vanity, compassion,

8    naivete and greed. As the urban dictionary says, "The first rule of grifting is, you can't cheat an

9    honest man."

10   This is not said to say that Cecrle, or more properly his lawyer, is "blaming the victim." But

11   in this case, perhaps more than any other case of fraud his lawyer has ever seen, there exists so little

12   to separate the true believers who were defendants and the ones who were ultimately labeled victims.

13   Neither group seemed capable of controlling their willingness to invest in something that sounded

14   too good to be true.

15   Jeanne Winkler is perhaps not the best example of one of Cecrle's victims, because most

16   others only chased after their bad investments with their own money. Beginning in 2006, Ms.

17   Winkler, an attorney representing Mr. Cecrle at times, dabbled in the promise of this scheme by

18   injecting small amounts of money. (We now know that some of that money was used by Mr. Cecrle

19   to pay his child support.) At the same time, Ms. Winkler began to put over $200 thousand into her

20   husband's construction business. When that needed more money as the economy tanked, she raided

21   her clients' trust account. At that point, she willingly suspended her remaining skepticism and

22   began to pour money into the "Cecrle dream" of fantastic returns on investment. (*See:* Doc. 376, Ex.

23   1, p. 21).

24   Perhaps Mr. Kelly Smith is more representative of a victim. Between April 2010 and July

25   2011 he made 43 deposits into one of the bank accounts, for a total of about $44 thousand. In his

26   victim statement, he states that he lost "over $100,000" because he believed Connie Fenton. He quit

27   his job and didn't work for three years, because he expected this imaginary ship to dock any day.

28   It seems Connie Fenton, a retired school teacher, was quite a natural born swindler.

1    Two other examples of a different sort of victim are presented in Ely Ades and Edith Hatzig.
2    Each seemed to admit to themselves that they had fallen for a very bad line. Ely Ades, for his part,
3    took the logical step of suing Cecrle and getting a money judgment. Ms. Hatzig, judging from her
4    victim impact statement, seemed content to chalk up the experience to a bad business decision where
5    the cost of the lesson was $23,565.

6                                              III.

7                                        Tom Cecrle.

8    He started life out with all the blessing of a white middle class life in Orange County
9    California. Although an average student, Tom Cecrle was big and strong and sports came naturally
10   to him. Life seemed to be rolling out in front of him quite easily. He even received a coveted
11   scholarship to play football for Cal. State Long Beach. Maybe if his knee hadn't gotten shattered,
12   things would have been different, but he lost the scholarship and soon left school.

13   One thing that Tom always seemed to have in abundance, was the gift of gab. He could talk
14   to anyone, and he was a good listener. This ability served him well in his eventual occupation of real
15   estate development. Beginning in 1986 and through 1998, Tom helped his company, B.H. Miller
16   Contractors play a pivotal role in the development of the business area around the McCarran
17   International Airport. Once again, things might have been different if Las Vegas hadn't gotten to
18   him as it has so many others. Tom discovered that he loved to gamble- to much, and habitual
19   gamblers *have to* lie.

20   That was Tom Cecrle's real talent. He could make himself believe something to the point
21   where it didn't matter if the thing were true or not. He was just as sincere and persuasive when
22   talking about it as if he was talking about the sky being blue.

23   So at this point in his life, with his sentencing hearing looming, to learn of the complete the
24   domestication of Mr. Cecrle might seem quite shocking. He always professed a great love of his
25   family and especially his four daughters, but was really not actively engaged in their lives due to his
26   instability. Then, with his arrest in this case, those relationships changed dramatically. Instead of
27   being emotionally committed but physically distant, Tom Cecrle went "all in" with his family.
28   / / /

                                              4

Two grandchildren were born while Tom was in pretrial detention. His mother, who had begun to degenerate as a consequence of Alzheimers, lost her ability to live independently and was thrust into various temporary living arrangements with relatives. Tom's brother Rick moved to Las Vegas with his family to led support to his brother and care for his mother, but that arrangement disintegrated under the pressure placed upon the blended families.

Today, Tom Cecrle finds himself in the sole role of care giver to his mother Mary, his daughters Hanna and Cayla, and soon to be, of his brother Rick. Rick had gone with his wife and children to Texas to search for a better job and to be closer to his wife's family. Recently diagnosed with bone cancer, Rick has separated from his wife and needs to come back to live with Tom while he begins chemotherapy treatments. Hanna is Tom's youngest daughter and to understand their relationship now, you need to know a little more about Tom's relationship with her mother.

Tom met Misty Menchaka about 15 years ago. Hanna was born about two years later. As time went on, Tom could see that Misty was starting to act a little differently in that she was jumpy and forgetful. One day he came home early and found Misty in the midst of ingesting some Meth. Tom was more upset however, over the fact that Misty was keeping her drug use a secret from him. His solution was to insist that she never do it in front of the children, and if she was going to do it, they should do it together. So began Tom's own period of addiction to methamphetamine.

Tom and Misty's shared physical custody of Hanna was interrupted only by his period of incarceration. Hanna was living with Tom when his condo was searched and he was arrested. After his release she stayed with Tom from time to time. Now, she lives with him full time.

Tom discovered that Hanna was simply walking away from school when Misty dropped her off there in the mornings. Misty couldn't deal with all that was going on with Hanna, and so she just turned Hanna over to Tom and told him to deal with it. He did. The first thing Tom did was schedule a conference with the school. He got Hanna, formerly an excellent student, to come back to school, with an agreement that they follow up with a counselor. When they went to the counselor, Hanna wanted her father there with her during the sessions- now numbering about one per week. Tom's support for his daughter cannot be replaced.

/ / /

5

Cayla is even more fragile than Hanna.  She developed a drug problem around the time that Tom was put in jail.  She quit oxycodone when she was pregnant with her daughter Priscilla, and has since supported herself as a cocktail waitress.  She stepped in to help obtain a residence for Tom and her grandmother when the arrangements with Rick's family ended.  Then, she met another man and she resumed using drugs.

Tom discovered this recently when he found Cayla in the midst of a seizure.  After being taken to the hospital, Tom found out that she was dealing with a high risk pregnancy and that her body was suffering from a lack of sugar.  Cayla stayed in the hospital for five days and her addiction was revealed there.  In the days that followed, Tom learned that the father of the unborn child was physically abusive and an enabler of the addictive cycle.

Hanna and Cayla will continue to stay with their father as long as possible.  A big factor in their problems, and now ironically, of their recovery, is finding a way to deal with their father being gone.  As for Mary, she now spends much of her days with Nellie Rae Jones, talking to her, helping out with her personal needs, and basically sharing what comfort the ladies can lend each other.  Rick needs his brother's support like he never has in his life.

IV.

The Impact of the Guideline Recommendation.

It is not often, and rarer still, for a Defendant to agree with the prosecutor's position.  On this point however, agreement is wholehearted.  It is error for a court to attach a presumption of reasonableness to the Guidelines range, or weigh the Guidelines more heavily than any other factor.  *United States v. Carty,* 520 F.3d 984, 994 (9th Cir. 2008).  Consequently there is no special deference due the guideline recommended in the PSR, or even the one agreed to by the Parties.  Weighing all of the factors, requires the Court to make an individual assessment of Mr. Cecrle and a determination that the eventual sentence is no greater than necessary to meet the ends of justice.  *See: Kimbrough v. United States,* 128 S.Ct. 558, 564 (2007).

A.  Do these guidelines even comport with the statutory objectives of sentencing?

In *Rita v. United States,* 127 S.Ct. 2456 (2007), the Court indulged in some reflection about the goals of sentencing and sentencing standards advocated in the Guidelines.  *Id.,* at 2473.  Justice

6

Ginsburg pointed out how things such as age, education, mental or emotional condition, and family ties, are not considered. She went on to say that because of that guidelines might only be a rough approximation of sentences that might be reached according to the objectives of 18 U.S.C. §3553(a). *Id.,* at 2465. It is certainly true that as a result of that debate, a District Court is non longer bound by standards governing Guideline departure, but is free to employ its discretion regarding variances for such things as health and family concerns. *C.f. United States v. Menyweather,* 431 F.3d 692 (9th Cir. 2005) (eight level variance upheld in embezzlement of $500,000 in light of broader, post-*Booker* discretion to weight multitude of factors previously deemed "not ordinarily relevant.").

    1. <u>Criminal History does not take into account the lack of risk that Cecrle will commit other crimes and is otherwise overstated.</u>

    Tom Cecrle is classified in Criminal History III. In order to assemble the necessary six points for that designation, the PSR had to begin with a driving under the influence case that was committed in 1993. (PSR, p. 13 at 57). Even so, the case had to have been kept open through 2006 because Cecrle could not focus on satisfying the punishment. The next two points came about in 2006 when Tom pled guilty to possession of his methamphetamine the first time. (PSR, p. 14 at 61). The next point was the result again of Cecrle's drug addiction. (PSR, p. 15 at 62). It took place the year following the incident at the casino.

    All of these are relatively minor offenses compared with those of other offenders who are classified in Category III. The same is true of the 2008 conviction for traffic offenses. The synopsis provided in the PSR for that case is also illustrative. Tom was booked into jail, not so much for the offense, but just as in the previous encounters, he had warrants for other minor offenses due to his drug use. (PSR, p. 16 at 64). The same thing occurred again in the instance that provides the sixth and final point of the calculation. As a result of his past minor offenses, Tom was searched and another drug charge was brought. (PSR, p. 17 at 66).

    Tom Cecrle has no felony convictions. It is appropriate for this Court to consider that Tom has no crimes of violence as might be the case with other offenders in Category III. Perhaps more importantly however, is that since his release from pretrial detention, Tom has remained completely drug free and has assumed the mantle of care giver and contributor to others' welfare.

2.  Effect of imprisonment.

At 50, Tom Cecrle is already considered a senior citizen by Bureau of Prison standards.  The Bureau itself has recognized that at this age, the normal functioning in a custodial setting is more difficult.  Long lines for food or processing are a norm of prison life.  Maneuvering between upper and lower bunks is harder.  Tom also goes in with a history of arthritis and high blood pressure.  *C.f. United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (three year term of probation for drug offense conspiracy where 54 year old's health problems and extraordinary post-arrest rehabilitation are considered).

Although the author of this memorandum typically shuns the urge to use string citations, it seems the most effective way to illustrate the depth of authority that would urge this Court to seriously consider the extraordinary family circumstances here where a prolonged period of incarceration would have a harsh effect on innocent family members.  The case of *United States v. Menyweather*, *supra.,* has already been cited for consideration on other grounds.  In that case our Circuit Court endorsed a departure of 8 levels because that defendant cared for his daughter, and this was considered an unusual situation as a single parent.  In another case, the Court of Appeals upheld departure for a defendant who was the sole care giver of a suicidal wife who suffered from renal failure.  *United States v. Leon*, 341 F.3d 928 (9th Cir. 2003).

Other Circuits have reached similar decisions.  *See: United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005) (on remand in a bank fraud case, the court was instructed to consider the defendant's role as caretaker for brain-damaged son even though alternative means of care existed.).  Also, *United States v. Dominguez*, 296 F.3d 192 (3rd Cir. 2002) (sentencing court could depart four levels in bank fraud case where the defendant resided with elderly parents, who were physically and financially dependant on her.).  Finally, *see United States v. Owen*, 145 F.3d 923 (7th Cir. 1998) (49 month downward adjustment for a defendant that maintained a good relationship with his children and the sentencing court believed his active role raising and supporting his family was atypical for a crack dealer, and lengthy imprisonment may have forced his wife on public-assistance, and finally, defendant spent time with is brother who was disabled.).

/ / /

3. <u>Post Arrest Rehabilitation</u>.

For a decade or more, Tom Cecrle supported himself and his addictions by lying to everyone around him. He has largely conquered those addictions. Whether it was the drugs that triggered his gambling, or the other way around, since he no longer uses drugs he has been forced to confront his better self. The Supreme Court considered such post offense conduct in *Gall v. United States*, 128 S. Ct. 586 at 593 & 599 (2007). In doing so it was stated in part as follows:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Id.,* at 598. *See also, United States v. Green*, 152 F.3d 1202 (9th Cir. 1998).

B. <u>Impact of the Loss Table</u>.

Although the restitution has been agreed to and discussed, the loss amount is a significant factor in that, according to the calculations under the advisory guideline, it adds 19 levels to this fraud case. For its part, the Commission has never explained the reasoning behind any of its specific offense characteristics, including the demarcations for amounts. Another question that remains unanswered as a result, is why the Guidelines identify amount over other factors, and in doing so has weighted loss in the way it has.

One obvious flaw in the loss schedule, has even been recognized by the Commission. The Sentencing Commission has released its preliminary proposed amendments to the Guidelines which indicate the intention to revise the loss tables to account for inflation. The proposal offers two possible options for future revisions, both of which increase the loss amount necessary to trigger the corresponding loss enhancement. For example, under a proposed amendment to U.S.S.G. § 2B1.1, the loss amount necessary to trigger an 18-level enhancement for loss is increases from $2,500,000 to $3,000,000.00. This Court is empowered to consider the Commission's anticipated, and long overdue, changes to the amounts necessary to trigger enhancements as further grounds to support a downward variance, regardless of the loss amount ultimately calculated in this case.

/ / /

/ / /

9

CONCLUSION

After consideration of the foregoing arguments, factual points and legal authorities, it is respectfully suggested that this Court engaged in deliberations for the upcoming sentencing of Tom Cecrle, that gives equal weight to all the factors that need to be considered. In doing so, the Court will undoubtedly consider whether 78 months or 120 months is warranted, but also it is expected that the Court will consider those factors that take this case out of the heartland of fraud cases and those that make this Defendant different than other fraud defendants. In light of lighter sentences being imposed on co-defendants, it is fully expected that at sentencing Mr. Cecrle will ask for a fair and just sentence that is substantially lower than the lowest recommendation.

DATED this 25th day of February, 2015.

Respectfully Submitted,

RENE L. VALLADARES
Federal Public Defender

*/s/ William Carrico*

By_____
William Carrico,
Assistant Federal Public Defender

1

## CERTIFICATE OF ELECTRONIC SERVICE

2          The undersigned hereby certifies that she is an employee of the Federal Public Defender for

3   the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

4          That on February 25, 2015, she served a copy of the above and foregoing **SENTENCING**

5   **MEMORANDUM OF DEFENDANT THOMAS CECRLE**, by electronic service (ECF) to the

6   person named below:

7          DANIEL G. BOGDEN
           United States Attorney
8          STEVEN MYHRE
           Assistant United States Attorney
9          333 Las Vegas Blvd. So. 5th Floor
           Las Vegas, NV 89101

10

11   Via e-mail:     Sandy Schmitt
                     U.S. Probation Officer

12

13                                   _/s/ Karen Meyer_____
                                     Employee of the Federal Public Defender

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28